3-10-0890, people of the state of Illinois, Anthony V. Sanchez and Joel O.C. v. Peter Sanchez, in the comments of Joel and Murphy. Thank you, Coach. You may. May it please the Court, I'm Clerk Sir Bayless, with the people of O.C. Again, my name is Joel Murphy. I represent Mr. Sanchez today. And it is not lost upon me, Your Honors, that this Court, probably all appellate courts, are just inundated with numerous and weak sufficiency of the evidence claims in criminal cases. However, every now and then, there comes along a finding of guilty that, in my humble opinion, actually shakes confidence in our system. And more than that, it's absolutely frightening that somebody could be convicted on such scant and bare evidence with such a very tiny, weak connection. What restores confidence in this system is that we have an appellate system where judges who are divorced from the passion and the anger, the need for responsibility or vengeance, whatever it may be, but can then look at these things objectively and correct these mistakes. And I believe, when you look at the evidence closely in this case, you will agree that this was insufficient evidence to remove reasonable doubt of guilt and provide us with the moral certainty that Mr. Sanchez was responsible for this crime. The defendant was alleged to have strangled the victim of death on September 9, 2006. And it is important to understand all of the players involved and the timeline of events and the scene of the crime. Now, the victim was found naked in her bed, strangled, and she was also stabbed in the face and neck area five times. And this was in the basement, where she lived, which is across the street from the defendant. She lived in this residence in the basement area with her husband, Mr. Jesus Regules. There was another individual that lived in the basement in a separate room named Pablo Alejandro, and then there were people that lived upstairs, a Jorge Gracia, I'll call him George if I may to save the syllable, as well as a cousin of his that had just recently arrived from Mexico. His name was Gabriel Sanchez. The wife and kids that lived with Mr. Gracia were gone that weekend, so the people that are upstairs are Ms. George, Ms. Gabriel Sanchez, and downstairs, again, you have the victim, her husband, and this other individual that lives down there. Now, they don't know the defendant, Mr. Sanchez, very well. They live across the street. He would occasionally go over there for a party or to watch a boxing fight or soccer, but the victim and the person who lived upstairs, wife, were friends with Hugo's sister, who also lived across the street, and significant because the uncontradicted testimony is that the victim was over at the defendant's residence every day. Now, on the day of the murder, the victim's husband had rested all day with the victim, and he left the house about 3.30. He had worked till about 1 a.m. When he came home around 2 a.m., he had found a door that appeared to be busted in. He found his wife naked and dead in the bed, and he yelled upstairs, and George upstairs called the police. George was present. So was this Mr. Sanchez, who was sleeping on the couch. Apparently he had been there all day. A paramedic had said that there were signs of rigor mortis when he showed up around 2 a.m., and he believes that that doesn't set in for about at least three hours. So now that puts the time of death the latest at 11 p.m. Earlier, George and Gabriel, who had lived upstairs, they had ate together. George left to go fishing around 1. Gabriel stayed there, and we know that, again, Jesus, the victim's husband, who had lived downstairs, he had left around 3.30. George had come back about 5.30 p.m. Gabriel's still there, and George left again around 6.45 p.m. to go to a dance. Gabriel's still there watching TV. So now this puts the window of the murder around 6.45, although this would have been just when her husband left, up to 11 p.m., slightly more than a four-hour window there. Jesus, George, and Pablo Alejandro all came home around the same time, about 1.50 or 2 a.m., and they found, again, Gabriel Sanchez asleep on the couch. So where is the defendant during this time? All of the witnesses have him coming home to his house across the street around 3.30, and he began working on his vehicle. They had a cookout at that house, and most of the witnesses have everyone eating around 6 p.m. Some witnesses have Hugo leaving his house, what he says was to go buy cigarettes, around 7.30. The only one who has him leaving earlier was then his girlfriend at the time, and she says he left around 6 p.m. At any rate, he returns around 9.30, give or take. While gone, the evidence showed that Hugo, the defendant, actually had walked approximately two miles to where his girlfriend's parents was. They were having some kind of issue at the time, and he actually busted out one of their windows with a paver brick. That was his testimony. Well, it was Elizabeth's testimony, also involving her father's testimony. What happened was, when he's gone, the father calls Elizabeth, asks what Hugo's doing, says his window was broken. When Hugo comes home, she confronts him about it. He says, no, I didn't do it. They go over to the parents' house. Again, he denies doing it, later admits to having done it. So I imagine if he's trying to set up some kind of alibi, you don't deny doing that at first. You say, yes, I was there. I went and broke out that window, but that's not what at first happened. He said he didn't do it. At any rate, he comes back. So help me understand this. You're saying that during that time frame, there's testimony that he went to his girlfriend's parents' house? Correct. And who gave that testimony? I believe his girlfriend, Elizabeth. Okay. Now, so the state's theory, I guess, is that in this window, that he would have either before or after, in this completely unrelated incident, going and busting out a window of his parents' house, and also went, and either by himself or with other people, busted in a door across the street and brutally raped and murdered the woman there. The only evidence, the only evidence that connects him to this crime is the fact that on some scrapings of fingernail clippings of the victim, they found some DNA of the defendant. They also had taken pictures of him about a week later, where he had some minor, like two or three, nicks or scratches on the top of his hand, I believe near his elbow and his forearm. So they're saying, oh, here's our connection. Here's our murderer. There's some DNA under these nails, and there are some scratches on him. Well, there's testimony as to those scratches by his girlfriend, wasn't there? I'm glad you bring that up, Your Honor. What actually is, the girlfriend, when she's first being interviewed, near the event, she says that there are scratches on his arm, I believe, but that they were from work. He said he was from working on his car. She never told the detective that he had scratches on his face, nor did the detective say that he had scratches on his face a week later. It was until trial, when she's no longer with the defendant, and whatever's going on with him, her parents, and her, that's when she said he had a scratch on his face. There's no other evidence that he had a scratch on his face, even when he apparently still has scratches on his arms that allegedly, by the state, would have occurred at this house. But again, he was also working on his car that day. More importantly, it's the state's own evidence. Their own expert is the one that said, this DNA can be transferred just simply by touching. To me, it seems more transferable than gunshot residue. It's simply by contact. She's over at the house every single day, at his house, every single day. He has to be upstairs because he doesn't have a bathroom, so he uses the same bathroom. They eat together. They watch TV together. She's over there every single day, and that DNA can be there just from simple contact. It can be from using the same hand towel. It can be from washing your hands in the bathroom. That's their evidence, that while this DNA could be there from scratching, it could also just be there from simple contact, and she's there every single day. That's uncontradicted. Now, regarding that DNA evidence and that very weak connection, we also have to look at all the other evidence of the crime scene that's pointing to everyone else besides the defendant. Yes. By the way, talking about that transfer of DNA, I mean, she said that the expert said, well, it's theoretically possible, but not. She didn't say it was likely, that it was just as likely that he could have got his DNA under there from scratches, but conceded that it was theoretically possible that that one could end up under her fingernails by casual contact. And that's what she said. I don't see the difference of her theories with regards to either one. They seem just as likely either way. I mean, she tried to qualify it at some point that said, I think her words were, I wouldn't expect this to come from casual contact, but, of course, it's on cross-examination where she concedes. Yeah, I mean, it could come from simple touching. It could come from using the same bathroom, using the same towel. Now, the scratches that they use as evidence, again, are from a photo, and just the person looking at the photo and saying, yeah, these could come from fingernails. They could also come from scraping against anything, a sharp object, you know, a car part, something in your house. There's no other evidence that links them to the scene. Did she, and this is really a lot of facts in this case. Did she say that at one point she testified that he didn't have those scratches when he left the house that night and had them when he came home? I don't recall, Judge. I don't recall, sorry. But, again, besides that evidence now, there are other people's prints found at the scene, found on the mattress. There are other people's blood there. Even this Pablo Miranda's guy's blood, his blood, along with the victim's blood, is on the makeshift curtain that they used as a makeshift door. It's a curtain that goes into her room in the basement. So his blood is on there. Her blood is on there. I believe there's some blood on the toilet seat they couldn't identify. And Gabriel Sanchez, the person who lived upstairs, his blood is found on some of his clothing. Additional male DNA is found in the victim's vagina, along with her husband's DNA. This Pablo Alejandro guy, he says, he says he got off work at 7.30. He went to a friend's. He drank a 12-pack of beer. Then he went home to get money because he wanted more beer, and he saw the victim dead, but he didn't call the police. Instead, he grabbed more money and went and bought another 12-pack of beer and drank it. Then he comes back at 2 a.m. when the police are already there. There's also cocaine found in the garage of the victim's resident. Looking at this connection, the fact that how this DNA may get under her fingernails, that nothing else puts him there, that all this evidence of other people's blood, other people's prints, everything else but him being there, to me it's kind of like saying, well, what if a hat or a shirt of defendants were found there, even though he'd been there a week before? He had a window to be there. There's something that says he was there. Therefore, he committed the murder because nothing says that DNA couldn't have been there before this evening, especially when she's there every single day. That bears connection. That's the only connection they have here. Regarding that Pablo Alejandro and Gabriel Sanchez, the testimony that the counsel knew about or the evidence or statements that they had given and known about, and the lack of testimony that he brought out, that brings me to the other two arguments regarding ineffective assistance of counsel. I don't enjoy making these arguments. I'm far from perfect, and, of course, everything's better in hindsight. But this is glaring here. If you look at how counsel handled this Mr. Pablo Alejandro, if my memory serves me correct, I think it's about three or four pages of cross-examination. Three or four pages. Which one? It's maybe three or four minutes? And let's look at what he had, the information that he had about Mr. Pablo Alejandro. When the detective first interviewed him, he didn't disclose at first that the victim even lived there. He said, I lived there with Jesus, which is the victim's husband. He claimed not to have seen the victim for a week prior to the murder. Besides George and his wife and kids, he claimed that nobody else or he didn't know lived upstairs, which would have been that Mr. Sanchez. And then, most incredibly, left out of there is Pablo's response to the detective when the detective asks him, what's the killer going to say when we find him? Now, I imagine you or me or anybody when they say, when a detective says, what's the killer going to say when we find him? Well, I don't know. How should I know? When he says, the killer's probably going to tell you that he sent me over there to kill the lady. What? Well, how does that point away from the defendant? How does that, how does that testimony, if it comes out, how does that point away from the defendant? Because it, I believe it shows a strong guilty conscience and circumstances that show that it's not the defendant that was there and did anything. It's these other people. And a jury didn't even get to hear that. They didn't even get to hear this guy's response to the detective's questionings, his evasiveness. Thank you. His evasiveness, anything of that nature. So, and there's no connection. A jury doesn't have a connection with these people and the defendant as if they're friends or if they hang out all the time or anything like that or if they somehow had met and planned something. There's just nothing there connecting any of these people other than, Hugo doesn't know them. He's been over there a couple of times because their daughter had a party or he's watched a fight, but there's nothing else. All they have is, well, his DNA is there and her fingernails. That's it. I believe a jury needed to hear all these other circumstances, hear this person's guilty consciousness. Frankly, I think it was inexcusable. It's inexcusable not to bring that evidence out and let a jury hear that. This may be a better question for Mr. Nicolosi, but how did he come to be a suspect in the first place? My review of the record shows that when the detective, you don't get to hear the substance of the conversation, I believe, the detective talked to either the Jesus or Jorge, and after speaking with them, that's when they went and spoke with Mr. Sanchez and they got his statements. They inferred a lot from him saying, well, I don't know these people. I've never talked to them. I never talked to the woman. Oh, but you had these greetings, right? Oh, yeah, greetings. She goes over to my house all the time, something like that. And then when they get the DNA under her fingernails, I think the blinders go on and then they have their guy right there. Gabriel Sanchez. He's also the last person to see the victim alive. He's present the entire day, even in the evening during this, and the state's going to say, well, he's unavailable. All that's hearsay. But him admitting to the cop, to the detective, which also never came out, him saying, yeah, it was unusual for me to stay home and be home all day that day, even though he was invited to go out and do things. It was unusual for me to be there. He says he heard a loud noise. I think you could get that statement out to show his opportunity to commit the crime, maybe even show his state of mind. Thank you, Mr. Murphy. Mr. Nicolosi. Good afternoon, Your Honors. May it please the Court, Mr. Murphy. Your Honors, starting with Issue 1, the people submit that there was sufficient evidence to convict this defendant. They believe that the, although there wasn't a large quantity of evidence, the quality of evidence certainly favors affirming this verdict. The circumstances surrounding Mr. Murphy's death and the defendant's evening that night are significant as the crime fits into his pattern of behavior. He walked to 16 Argyle Street in Joliet, broke the window. There's a lot of discrepancies as to the times of everything that happened. When he left 503 Crackar,  of course, because he left, the parties stipulated the fact that he broke the window, called his girlfriend's father, made sure no one was home, broke the window, and then came back, went to 504 Crackar, broke in with somebody else, committed a crime against the victim, and then arrived home at anywhere between 9 and 10. His girlfriend said 10. A lot of other people said 9, 930, again, discrepancies. But the crime clearly happened at some point in that time period. You said there was someone else that broke in with him. I know that you speculate on that in your brief, but... The people just said that... Is there some evidence beyond that? Yes, Your Honor. The people submit that there was lots of physical evidence in the basement of 504 Crackar that didn't match any of the five suspect cards that they took, which I believe were Jesus, Jorge, Gabriel, Carlos de Zuul, and Pablo. There was the stains on the door, the stains on the toilet, there was a palm print on the bed that didn't match any of those gentlemen, didn't match the defendant either. Therefore, the people think it reasonable to presume that someone else was there and someone else was involved in this crime. But none of that changes the fact that the people submit that this defendant was definitely one of the two people that was there. Again, the quality of evidence here is that the individual who conducted the autopsy looked at the photos, said that the scratches on his arm, which Your Honor's discussed this with Mr. Murphy, whether the scratches were there on the defendant when he left at around 6 o'clock. And his girlfriend at the time testified that they were not there at 6 o'clock when he left. I discussed this in my brief. But she noticed that they were there when he got back at 10 o'clock. Therefore, it's reasonable to assume that as the jury did here, fully capable of doing here, that he got those at 5 o'clock and that, of course, corroborates with the fact that his DNA was found under the fingernails of the victim. Now, the opposing counsel is calling into question the extent of that, the testimony about the DNA under the fingernails. He's saying that it's just as likely to have come from casual contact at his home during the prior week or prior time as it is through a struggle. Well,    I believe her name was Kathleen Sullivan, testified that it is, as Judge Schmidt pointed out earlier, that the DNA was found under the fingernails of the victim and that it's possible for casual contact, casual touching after casual contact to get such DNA under your fingers, but she said in her experience that this is more DNA than is expected from that kind of casual touching, which, of course, the jury heard and, you know, drew the conclusion that it takes more than just touching a towel or touching a table in this circumstances to get that DNA under the fingers and clearly scratching somebody who was attacking you is more than touching a towel and would more likely leave this type of evidence and Kathleen Sullivan was pretty clear about that in her testimony, Your Honor. That is all on issue one, Your Honors. So really all you have is the DNA. That's what convicted did, isn't it? Basically, Your Honor, as I mentioned earlier, the circumstances surrounding the defendant's evening, also the fact that I mentioned just previously the fact that three different people testified that the defendant was wet, sweating, after he came back. People said that this had to do with him walking to 16 Argyle, takes 35 minutes according to the testimony to get there, broke the window, had to walk all the way back another 35 minutes and of course was involved in a very intense confrontation in the basement of 504 Cracker and the circumstances surrounding his evening, plus the DNA evidence, Your Honor, that people submit that the jury heard the evidence convict him and wasn't sure. What is the evidence that he went to Argyle, did this, and came back? The parties stipulated that he broke the window at Argyle. The parties stipulated? The parties, yeah. There was a stipulation below that he went to 16 Argyle, Your Honor. Was there a stipulation as to how he got there? No, but the party, the defendant's witnesses and his girlfriend testified that they all saw him walk to, they didn't see him walk to 16 Argyle, of course, but they saw him walking away from the house. Everybody testified he left somewhere between six and seven and walked. The people are just drawing the, just kind of connecting the dots here, and the jury, again, heard this, they were the trier of the factor, they connected the dots as well, and people believe that this is clearly a rational puzzle   case. I can, if you would allow me to find in the record where I cite the fact that the defense and the prosecution stipulated the fact that he did go to 16 Argyle. You don't need to do that, I just don't understand the stipulation reason. Nevertheless, Your Honor, I don't remember kind of focusing in           stipulated that he did go to 16 Argyle. I don't remember the fact that the prosecution stipulated that he did go to 16 Argyle.  remember the stipulation reason. I will agree with Mr. Murphy on that one for lack of further understanding on my part. Your Honor, as for issues 2, 3, and 4, the people would stand on their briefs, unless there are any questions. I will be happy to answer any of those issues. All right. Thank you, Mr. Pelosi. Mr.  any rebuttal? Your Honor, for whatever it's worth, the stipulations that were included in the evidence are in the report proceedings from 625 to 628, and that they stipulate the distance between his house and Elizabeth's parents' house, how much time it would take to drive there, how much time it would take to walk there, the substance found in the garage was not in cocaine, and the fact that Hugo broke Elizabeth's parents' glass patio door using a brick paper, that no evidence of any blood was found there, and that the statement of Hugo in the interview with Landeros was true and accurate. So it's agreed it's stipulated in the statute  Hugo broke his glass patio door. Whether he walked or drove, the only evidence with regards to that are people's testimony that when they saw him leave the house, he walked around a corner. Now, I certainly agree with the State that it's true that Hugo broke his glass patio door,  the only evidence with regards to that is people's testimony that when they saw him leave the house, he walked around a corner. Now, the only evidence with regards to that is people's testimony that he          there, and somehow Mr. Sanchez is the only one clean enough or in this violent struggle that he's not going to leave any evidence of him being there. None of this makes sense, and it's not proof beyond a reasonable doubt. It's not proof beyond a reasonable doubt. It's not proven by     and it    write  to   testimony with other people, if we don't have good evidence. So it is certainly not possible that something like this could be